SECURITIES AND EXCHANGE COMMISSION ET AL. *v.*
JERRY T. O'BRIEN, INC., ET AL.

No. 83–751.   Argued April 17, 1984—Decided June 18, 1984

*Deputy Solicitor General Geller* argued the cause for petitioners. With him on the briefs were *Solicitor General Lee, Samuel A. Alito, Jr., Daniel L. Goelzer, Paul Gonson, Linda D. Fienberg, Larry R. Lavoie, Harry J. Weiss,* and *Elizabeth A. Spurlock.*

*William D. Symmes* argued the cause for respondents. With him on the brief for respondents Magnuson et al. was *Thomas D. Cochran. C. Dean Little* and *D. William Toone* filed a brief for respondents Jerry T. O'Brien, Inc., et al.*

JUSTICE MARSHALL delivered the opinion of the Court.

The Securities and Exchange Commission (SEC or Commission) has statutory authority to conduct nonpublic investigations into possible violations of the securities laws and, in the course thereof, to issue subpoenas to obtain relevant information. The question before us is whether the Commission must notify the "target" of such an investigation when it issues a subpoena to a third party.

I

This case represents one shard of a prolonged investigation by the SEC into the affairs of respondent Harry F. Magnuson and persons and firms with whom he has dealt. The investigation began in 1980, when the Commission's staff reported to the Commission that information in their possession tended to show that Magnuson and others had been trading in the stock of specified mining companies in a manner violative of the registration, reporting, and antifraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934. In response, the Commission issued a Formal

---

*Michael P. Cox* filed a brief for the North American Securities Administrators Association, Inc., as *amicus curiae* urging reversal.

*Ronald L. Olson* filed a brief for Wedbush, Noble, Cooke, Inc., as *amicus curiae* urging affirmance.

Order of Investigation[1] authorizing employees of its Seattle Regional Office to initiate a "private investigation" into the transactions in question and, if necessary, to subpoena testimony and documents "deemed relevant or material to the inquiry." Complaint, Exhibit A, pp. 3–4.

Acting on that authority, members of the Commission staff subpoenaed financial records in the possession of respondent Jerry T. O'Brien, Inc. (O'Brien), a broker-dealer firm, and respondent Pennaluna & Co. (Pennaluna). O'Brien voluntarily complied, but Pennaluna refused to disgorge the requested materials. Soon thereafter, in response to several inquiries by O'Brien's counsel, a member of the SEC staff informed O'Brien that it was a "subject" of the investigation.

O'Brien, Pennaluna, and their respective owners[2] promptly filed a suit in the District Court for the Eastern District of Washington, seeking to enjoin the Commission's investigation and to prevent Magnuson from complying with subpoenas that had been issued to him.[3] Magnuson filed a cross-claim, also seeking to block portions of the investiga-

---

[1] A Formal Order of Investigation is issued by the Commission only after its staff has conducted a preliminary inquiry, in the course of which "no process is issued [nor] testimony compelled." 17 CFR § 202.5(a) (1983). The purposes of such an order seem to be to define the scope of the ensuing investigation and to establish limits within which the staff may resort to compulsory process. See H. R. Rep. No. 96–1321, pt. 1, p. 2 (1980).

[2] The relationships between O'Brien, Pennaluna, and their individual owners are not fully elucidated by the papers before us. Because, for the purposes of this litigation, the interests of all of these respondents are identical, hereinafter they will be referred to collectively as O'Brien, except when divergence in their treatment by the courts below requires that they be differentiated.

[3] The principal bases of O'Brien's suit were that the SEC's Formal Order of Investigation was defective, that the investigation did not have a valid purpose, that the Commission should have afforded the subjects of the investigation a chance to comment upon it, and that the issues around which the case revolved had been litigated and settled in another proceeding. Complaint 9–15.

tion.   O'Brien then filed motions seeking authority to depose the Commission's officers and to conduct expedited discovery into the Commission's files.[4]

The District Court denied respondents' discovery motions and soon thereafter dismissed their claims for injunctive relief. *Jerry T. O'Brien, Inc.* v. *SEC*, No. C-81-546 (ED Wash., Jan. 20, 1982).   The principal ground for the court's decision was that respondents would have a full opportunity to assert their objections to the basis and scope of the SEC's investigation if and when the Commission instituted a subpoena enforcement action.   The court did, however, rule that the Commission's outstanding subpoenas[5] met the requirements outlined in *United States* v. *Powell*, 379 U. S. 48 (1964), for determining whether an administrative summons is judicially enforceable.   Specifically, the District Court held that the Commission had a legitimate purpose in issuing the subpoenas, that the requested information was relevant and was not already in the Commission's possession, and that the issuance of the subpoenas comported with pertinent procedural requirements.

Following the District Court's decision, the SEC issued several subpoenas to third parties.   In response, Magnuson and O'Brien renewed their request to the District Court for injunctive relief, accompanying the request with a motion, pursuant to Rule 62(c) of the Federal Rules of Civil Procedure, for a stay pending appeal.   For the first time, respondents expressly sought notice of the subpoenas issued by the Commission to third parties.   Reasoning that respondents lacked standing to challenge voluntary compliance with sub-

---

[4] During the pendency of the suit, the Commission, at the District Court's request, refrained from seeking enforcement of its outstanding subpoenas.

[5] Because no subpoenas were then outstanding against Jerry T. O'Brien, Inc., or O'Brien in his personal capacity, the District Court declined to determine whether the Commission had complied with the *Powell* standards in demanding records from those respondents.

poenas by third parties, and that, in any subsequent proceeding brought by the SEC, respondents could move to suppress evidence the Commission had obtained from third parties through abusive subpoenas, the District Court denied the requested relief. *Jerry T. O'Brien, Inc.* v. *SEC*, No. C–81–546 (ED Wash., Mar. 25, 1982).[6]

A panel of the Court of Appeals for the Ninth Circuit affirmed the District Court's denial of injunctive relief with regard to the subpoenas directed at respondents themselves, agreeing with the lower court that respondents had an adequate remedy at law for challenging those subpoenas.[7] 704 F. 2d 1065, 1066–1067 (1983). However, the Court of Appeals reversed the District Court's denial of respondents' request for notice of subpoenas issued to third parties. In the Court of Appeals' view, "targets" of SEC investigations "have a right to be investigated consistently with the *Powell* standards." *Id.*, at 1068. To enable targets to enforce this right, the court held that they must be notified of subpoenas issued to others. *Id.*, at 1069.

The Court of Appeals denied the Commission's request for rehearing and rejected its suggestion for rehearing en banc. 719 F. 2d 300 (1983). Judge Kennedy, joined by four other judges, dissented from the rejection, arguing that the panel decision was unprecedented and threatened the ability of the

---

[6] The District Court granted respondents a brief stay to enable them to petition the Court of Appeals for a longer stay pending disposition of the appeal, but the Court of Appeals refused to enjoin the Commission from proceeding with its investigation. The SEC then filed various subpoena enforcement actions. The Commission has prevailed in at least one of those suits, *SEC* v. *Magnuson*, No. 82–1178–Z (Mass., Aug. 11, 1982) (enforcing subpoenas to Magnuson family members); another is still pending, see *SEC* v. *Magnuson, et al.*, No. C–82–282–RJM (ED Wash., filed Apr. 19, 1982). Cf. *Magnuson* v. *SEC*, No. 82–2042 (Idaho, July 27, 1982) (rejecting motion by Magnuson and his wife to quash subpoenas directed to a financial institution).

[7] Because respondents have not cross-petitioned, the validity of the Court of Appeals' ruling on the merits of respondents' claims for injunctive relief with regard to the subpoenas directed at themselves is not before us.

SEC and other agencies to conduct nonpublic investigations into possible violations of federal law. *Ibid.*

We granted certiorari because of the importance of the issue presented. 464 U. S. 1038 (1984). We now reverse.

## II

Congress has vested the SEC with broad authority to conduct investigations into possible violations of the federal securities laws and to demand production of evidence relevant to such investigations. *E. g.*, 15 U. S. C. §§ 77s(b), 78u(a), (b).[8] Subpoenas issued by the Commission are not self-enforcing, and the recipients thereof are not subject to penalty for refusal to obey. But the Commission is authorized to bring suit in federal court to compel compliance with its process. *E. g.*, 15 U. S. C. §§ 77v(b), 78u(c).[9]

No provision in the complex of statutes governing the SEC's investigative power expressly obliges the Commission to notify the "target" of an investigation when it issues a subpoena to a third party. If such an obligation is to be imposed on the Commission, therefore, it must be derived from one of three sources: a constitutional provision; an understanding on the part of Congress, inferable from the structure of the securities laws, regarding how the SEC should conduct its inquiries; or the general standards governing judicial

---

[8] The provisions cited in the text are the pertinent provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934, respectively. In conducting the investigation that gives rise to this case, the Commission relied solely on those Acts. Many other statutes administered by the SEC contain similar provisions. See 15 U. S. C. § 79r (Public Utility Holding Company Act of 1935); 15 U. S. C. § 77uuu(a) (Trust Indenture Act of 1939); 15 U. S. C. §§ 80a–41(a), (b) (Investment Company Act of 1940); 15 U. S. C. §§ 80b–9(a), (b) (Investment Advisers Act of 1940).

[9] The analogous enforcement provisions for the other statutes administered by the Commission are: 15 U. S. C. § 79r(d) (Public Utility Holding Company Act of 1935); 15 U. S. C. § 77uuu(a) (incorporating by reference 15 U. S. C. § 77v(b)) (Trust Indenture Act of 1939); 15 U. S. C. § 80a–41(c) (Investment Company Act of 1940); 15 U. S. C. § 80b–9(c) (Investment Advisers Act of 1940).

enforcement of administrative subpoenas enunciated in *United States* v. *Powell*, 379 U. S. 48 (1964), and its progeny. Examination of these three potential bases for the Court of Appeals' ruling leaves us unpersuaded that the notice requirement fashioned by that court is warranted.

## A

Our prior cases foreclose any constitutional argument respondents might make in defense of the judgment below. The opinion of the Court in *Hannah* v. *Larche*, 363 U. S. 420 (1960), leaves no doubt that neither the Due Process Clause of the Fifth Amendment nor the Confrontation Clause of the Sixth Amendment is offended when a federal administrative agency, without notifying a person under investigation, uses its subpoena power to gather evidence adverse to him. The Due Process Clause is not implicated under such circumstances because an administrative investigation adjudicates no legal rights, *id.*, at 440–443, and the Confrontation Clause does not come into play until the initiation of criminal proceedings, *id.*, at 440, n. 16. These principles plainly cover an inquiry by the SEC into possible violations of the securities laws.

It is also settled that a person inculpated by materials sought by a subpoena issued to a third party cannot seek shelter in the Self-Incrimination Clause of the Fifth Amendment. The rationale of this doctrine is that the Constitution proscribes only *compelled* self-incrimination, and, whatever may be the pressures exerted upon the person to whom a subpoena is directed,[10] the subpoena surely does not "compel" anyone else to be a witness against himself. *Fisher* v. *United States*, 425 U. S. 391, 397 (1976); *Couch* v. *United States*, 409 U. S. 322, 328–329 (1973). If the "target" of an investigation by the SEC has no Fifth Amendment right to challenge enforcement of a subpoena directed at a third

---

[10] Cf. *United States* v. *Doe*, 465 U. S. 605, 612–613 (1984).

party, he clearly can assert no derivative right to notice when the Commission issues such a subpoena.

Finally, respondents cannot invoke the Fourth Amendment in support of the Court of Appeals' decision. It is established that, when a person communicates information to a third party even on the understanding that the communication is confidential, he cannot object if the third party conveys that information or records thereof to law enforcement authorities. *United States* v. *Miller*, 425 U. S. 435, 443 (1976). Relying on that principle, the Court has held that a customer of a bank cannot challenge on Fourth Amendment grounds the admission into evidence in a criminal prosecution of financial records obtained by the Government from his bank pursuant to allegedly defective subpoenas, despite the fact that he was given no notice of the subpoenas. *Id.*, at 443, and n. 5.[11] See also *Donaldson* v. *United States*, 400 U. S. 517, 522 (1971) (Internal Revenue summons directed to third party does not trench upon any interests protected by the Fourth Amendment).[12] These rulings disable respondents from arguing that notice of subpoenas issued to third parties is necessary to allow a target to prevent an unconstitutional search or seizure of his papers.

B

The language and structure of the statutes administered by the Commission afford respondents no greater aid. The provisions vesting the SEC with the power to issue and seek enforcement of subpoenas are expansive. For example, § 19(b)

---

[11] It should be noted that any Fourth Amendment claims that might be asserted by respondents are substantially weaker than those of the bank customer in *Miller* because respondents, unlike the customer, cannot argue that the subpoena recipients were required by law to keep the records in question. Cf. 425 U. S., at 455–456 (MARSHALL, J., dissenting).

[12] Cf. *Donovan* v. *Lone Steer, Inc.*, 464 U. S. 408, 414–415 (1984) (discussing the Fourth Amendment rights of the *recipient* of an administrative subpoena).

of the Securities Act of 1933, 48 Stat. 85–86, empowers the SEC to conduct investigations "which, in the opinion of the Commission, are necessary and proper for the enforcement" of the Act and to "require the production of any books, papers, or other documents which the Commission deems relevant or material to the inquiry." 15 U. S. C. § 77s(b). Similarly, §§ 21(a) and 21(b) of the Securities Exchange Act of 1934, 48 Stat. 899, 900, authorize the Commission to "make such investigations as it deems necessary to determine whether any person has violated, is violating, or is about to violate any provision of this chapter [or] the rules or regulations thereunder" and to demand to see any papers "the Commission deems relevant or material to the inquiry." 15 U. S. C. §§ 78u(a), (b).[13]

More generally, both statutes vest the SEC with "power to make such rules and regulations as may be necessary or appropriate to implement [their] provisions . . . ." 15 U. S. C. §§ 77s(a), 78w(a)(1). Relying on this authority, the SEC has promulgated a variety of rules governing its investigations, one of which provides that, "[u]nless otherwise ordered by the Commission, all formal investigative proceedings shall be non-public." 17 CFR § 203.5 (1983). In other words, the Commission has formally adopted the policy of not routinely informing anyone, including targets, of the existence and progress of its investigations.[14] To our knowledge, Congress has never questioned this exercise by the Commission of its statutory power. And, in another context, we have held that rulemaking authority comparable to that enjoyed by the SEC is broad enough to empower an agency to "establish

---

[13] The other statutes administered by the SEC contain similarly broad delegations of investigatory power. See the provisions cited in n. 8, *supra.*

[14] In practice, virtually all investigations conducted by the Commission are nonpublic. See 3 L. Loss, Securities Regulation 1955 (2d ed. 1961); SEC, Report of the Advisory Committee on Enforcement Policies and Practices 18 (1972).

standards for determining whether to conduct an investigation publicly or in private." *FCC* v. *Schreiber*, 381 U. S. 279, 292 (1965).

It appears, in short, that Congress intended to vest the SEC with considerable discretion in determining when and how to investigate possible violations of the statutes administered by the Commission. We discern no evidence that Congress wished or expected that the Commission would adopt any particular procedures for notifying "targets" of investigations when it sought information from third parties.

The inference that the relief sought by respondents is not necessary to give effect to congressional intent is reinforced by the fact that, in one special context, Congress has imposed on the Commission an obligation to notify persons directly affected by its subpoenas. In 1978, in response to this Court's decision in *United States* v. *Miller, supra,*[15] Congress enacted the Right to Financial Privacy Act, 92 Stat. 3697, 12 U. S. C. § 3401 *et seq.* That statute accords customers of banks and similar financial institutions certain rights to be notified of and to challenge in court administrative subpoenas of financial records in the possession of the banks. The most salient feature of the Act is the narrow scope of the entitlements it creates. Thus, it carefully limits the kinds of customers to whom it applies, §§ 3401(4), (5), and the types of records they may seek to protect, § 3401(2). A customer's ability to challenge a subpoena is cabined by strict procedural requirements. For example, he must assert his claim within a short period of time, § 3410(a), and cannot appeal an adverse determination until the Government has completed its investigation, § 3410(d). Perhaps most importantly, the statute is drafted in a fashion that minimizes the risk that customers' objections to subpoenas will delay or frustrate agency inves-

---

[15] See H. R. Rep. No. 95–1383, p. 34 (1978) (the purpose of the statute is to fill the gap left by the ruling in *Miller* that a bank customer has "no standing under the Constitution to contest Government access to financial records").

tigations.   Thus, a court presented with such a challenge is required to rule upon it within seven days of the Government's response, § 3410(b), and the pertinent statutes of limitations are tolled while the claim is pending, § 3419. Since 1980, the SEC has been subject to the constraints of the Right to Financial Privacy Act.   Pub. L. 96–433, § 3, 94 Stat. 1855, 15 U. S. C. § 78u(h)(1).   When it made the statute applicable to the SEC, however, Congress empowered the Commission in prescribed circumstances to seek *ex parte* orders authorizing it to delay notifying bank customers when it subpoenas information about them, thereby further curtailing the ability of persons under investigation to impede the agency's inquiries.   15 U. S. C. § 78u(h)(2).

Considerable insight into the legislators' conception of the scope of the SEC's investigatory power can be gleaned from the foregoing developments.   We know that Congress recently had occasion to consider the authority of the SEC and other agencies to issue and enforce administrative subpoenas without notifying the persons whose affairs may be exposed thereby.   In response, Congress enacted a set of carefully tailored limitations on the agencies' power, designed "to strike a balance between customers' right of privacy and the need of law enforcement agencies to obtain financial records pursuant to legitimate investigations."   H. R. Rep. No. 95–1383, p. 33 (1978).   The manner in which Congress dealt with this problem teaches us two things.   First, it seems apparent that Congress assumed that the SEC was not and would not be subject to a general obligation to notify "targets" of its investigations whenever it issued administrative subpoenas.[16]   Second, the complexity and subtlety of the

---

[16] In this regard, it is noteworthy that the pertinent congressional Committees expressed their desire that the judiciary not supplement the remedies created by the statute with any implied causes of action. See H. R. Rep. No. 96–1321, pt. 1, p. 10 (1980); H. R. Rep. No. 95–1383, pp. 54, 56, 225, 230 (1978).

procedures embodied in the Right to Financial Privacy Act suggest that Congress would find troubling the crude and unqualified notification requirement ordered by the Court of Appeals.[17]

## C

The last of the three potential footings for the remedy sought by respondents is some other entitlement that would be effectuated thereby. Respondents seek to derive such an entitlement from a combination of our prior decisions. Distilled, their argument is as follows: A subpoena issued by the SEC must comport with the standards set forth in our decision in *United States* v. *Powell*, 379 U. S., at 57–58.[18] Not

---

[17] The significance of these two lessons is not that they illuminate Congress' intent when it enacted or when it subsequently amended the crucial provisions vesting the Commission with investigatory authority, see *supra*, at 743–744. Rather, they inform our determination whether adoption of the remedy proposed by respondents would comport with or disrupt the system of statutes governing the issuance and trading of securities, as that system has been modified and refined by Congress in the years since 1933. In this regard, our inquiry is analogous to the kind of analysis contemplated by the third of the four factors we consider when deciding whether it would be appropriate to create a private right of action as an adjunct to a right created by statute: "[I]s it consistent with the underlying purposes of the legislative scheme to imply such a remedy . . . ?" See, *e. g.*, *Cannon* v. *University of Chicago*, 441 U. S. 677, 688, n. 9, 703–708 (1979); *Cort* v. *Ash*, 422 U. S. 66, 78 (1975).

[18] The holding of *Powell* was that the Commissioner of Internal Revenue need not demonstrate probable cause in order to secure judicial enforcement of a summons issued pursuant to § 7602 of the Internal Revenue Code. The Court then went on to sketch the requirements that the Commissioner would be obliged to satisfy:

"He must show that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to that purpose, that the information sought is not already within the Commissioner's possession, and that the administrative steps required by the Code have been followed . . . . [A] court may not permit its process to be abused. Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle

only the recipient of an SEC subpoena, but also any person who would be affected by compliance therewith, has a substantive right, under *Powell*, to insist that those standards are met.  A target of an SEC investigation may assert the foregoing right in two ways.  First, relying on *Reisman* v. *Caplin*, 375 U. S. 440, 445 (1964), and *Donaldson* v. *United States*, 400 U. S., at 529,[19] the target may seek permissive intervention in an enforcement action brought by the Commission against the subpoena recipient.  Second, if the recipient of the subpoena threatens voluntarily to turn over the requested information, the target "might restrain compliance" by the recipient, thereby forcing the Commission to institute an enforcement suit.  See *Reisman* v. *Caplin, supra,* at 450.  A target can avail himself of these options only if he is aware of the existence of subpoenas directed at others.  To ensure that ignorance does not prevent a target from asserting his

a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." 379 U. S., at 57–58 (footnote omitted).

See *United States* v. *LaSalle National Bank,* 437 U. S. 298, 313–314 (1978).  Some lower courts have held or assumed that the SEC must satisfy these standards in order to obtain enforcement of its subpoenas. *E. g., SEC* v. *ESM Government Securities, Inc.,* 645 F. 2d 310, 313–314 (CA5 1981).  But cf. *In re EEOC,* 709 F. 2d 392, 398, n. 2 (CA5 1983). Respondents contend that the obligation of an agency to follow pertinent "administrative steps" means in this context that any subpoena issued under the auspices of the SEC must come within the purview of a Formal Order of Investigation, see n. 1, *supra.*  Because of the manner in which we dispose of this case, we have no occasion to pass upon respondents' characterization or application of our decision in *Powell.*

[19] In *Reisman,* the Court indicated in dictum that "both parties summoned [under § 7602] and those affected by a disclosure may appear or intervene before the District Court and challenge the summons by asserting their constitutional or other claims." 375 U. S., at 445; see *id.,* at 449. Our decision in *Donaldson* made clear that the right of a third party to intervene in an enforcement action "is permissive only and is not mandatory," 400 U. S., at 529, and that determination whether intervention should be granted in a particular case requires "[t]he usual process of balancing opposing equities," *id.,* at 530.

rights, respondents conclude, the Commission must notify him when it issues a subpoena to a third party.

There are several tenuous links in respondents' argument. Especially debatable are the proposition that a target has a substantive right to be investigated in a manner consistent with the *Powell* standards and the assertion that a target may obtain a restraining order preventing voluntary compliance by a third party with an administrative subpoena. Certainly we have never before expressly so held. For the present, however, we may assume, *arguendo*, that a target enjoys each of the substantive and procedural rights identified by respondents. Nevertheless, we conclude that it would be inappropriate to elaborate upon those entitlements by mandating notification of targets whenever the Commission issues subpoenas.

Two considerations underlie our decision on this issue. First, administration of the notice requirement advocated by respondents would be highly burdensome for both the Commission and the courts. The most obvious difficulty would involve identification of the persons and organizations that should be considered "targets" of investigations.[20] The SEC often undertakes investigations into suspicious securities transactions without any knowledge of which of the parties involved may have violated the law.[21] To notify all potential wrongdoers in such a situation of the issuance of each subpoena would be virtually impossible. The Commission would thus be obliged to determine the point at which enough evidence had been assembled to focus suspicion on a manage-

---

[20] Neither the pertinent statutes nor the Commission's regulations define the term "target," so either the Commission or the courts would be obliged at the outset to develop a working definition of the term.

[21] So, for example, the Commission is sometimes called upon to investigate unusually active trading in the stock of a company during the period immediately preceding a tender offer for that stock. In such a case, the Commission may have no idea which (if any) of the thousands of purchasers had improper access to inside information.

able subset of the participants in the transaction, thereby lending them the status of "targets" and entitling them to notice of the outstanding subpoenas directed at others. The complexity of that task is apparent. Even in cases in which the Commission could identify with reasonable ease the principal targets of its inquiry, another problem would arise. In such circumstances, a person not considered a target by the Commission could contend that he deserved that status and therefore should be given notice of subpoenas issued to others. To assess a claim of this sort, a district court would be obliged to conduct some kind of hearing to determine the scope and thrust of the ongoing investigation.[22] Implementation of this new remedy would drain the resources of the judiciary as well as the Commission.[23]

Second, the imposition of a notice requirement on the SEC would substantially increase the ability of persons who have something to hide to impede legitimate investigations by the Commission. A target given notice of every subpoena issued to third parties would be able to discourage the recipients from complying, and then further delay disclosure of damaging information by seeking intervention in all enforcement actions brought by the Commission. More seriously, the understanding of the progress of an SEC inquiry that would flow from knowledge of which persons had received subpoenas would enable an unscrupulous target to destroy or alter documents, intimidate witnesses, or transfer securities or funds so that they could not be reached by the Government.[24] Especially in the context of securities regulation,

---

[22] Cf. 704 F. 2d 1065, 1069 (CA9 1983) (case below) ("The target's right could be asserted . . . by other appropriate district court proceedings").

[23] This remedy would also have the effect of laying bare the state of the Commission's knowledge and intentions midway through investigations. For the reasons sketched below, such exposure could significantly hamper the Commission's efforts to police violations of the securities laws.

[24] See *PepsiCo* v. *SEC*, 563 F. Supp. 828, 832 (SDNY 1983) (To impose a notification requirement on the SEC "would necessarily permit all targets—and presumably all potential targets—effectively to monitor the course and conduct of agency investigations. Experience and common

where speed in locating and halting violations of the law is so important, we would be loathe to place such potent weapons in the hands of persons with a desire to keep the Commission at bay.

We acknowledge that our ruling may have the effect in practice of preventing some persons under investigation by the SEC from asserting objections to subpoenas issued by the Commission to third parties for improper reasons. However, to accept respondents' proposal "would unwarrantedly cast doubt upon and stultify the [Commission's] every investigatory move," *Donaldson* v. *United States*, 400 U. S., at 531. Particularly in view of Congress' manifest disinclination to require the Commission to notify targets whenever it seeks information from others, see *supra*, at 746–747, we refuse so to curb the Commission's exercise of its statutory power.[25]

### III

Nothing in this opinion should be construed to imply that it would be improper for the SEC to inform a target that it has issued a subpoena to someone else. But, for the reasons indicated above, we decline to curtail the Commission's discretion to determine when such notice would be appropriate and when it would not. Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

sense should establish that such a power would be greatly abused . . ."); cf. *NLRB* v. *Robbins Tire & Rubber Co.*, 437 U. S. 214, 239 (1978) (citing the risk that employers or unions would attempt to "coerce or intimidate employees and others who have given statements" as a reason for holding exempt from disclosure under the Freedom of Information Act statements made to the National Labor Relations Board).

[25] Cf. *United States* v. *Arthur Young & Co.*, 465 U. S. 805, 816 (1984) ("'[A]bsent unambiguous directions from Congress,'" the summons power conferred on the Internal Revenue Service by statute should not be restricted by the courts) (quoting *United States* v. *Bisceglia*, 420 U. S. 141, 150 (1975)).