[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13990

_____

D.C. Docket No. 1:19-mc-20493-UU


SECURITIES AND EXCHANGE COMMISSION,

Plaintiff - Appellee,

versus

CARLA MARIN,

Defendant - Appellant.


_____

No. 19-14871

_____

D.C. Docket No.  1:19-mc-20496-KMW


SECURITIES AND EXCHANGE COMMISSION,

Plaintiff - Appellee,

versus

MINTRADE TECHNOLOGIES, LLC,

Defendant - Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(December 14, 2020)

Before WILLIAM PRYOR, Chief Judge, HULL and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

Carla Marin and MinTrade Technologies, LLC ("MinTrade") each appeal separate district court orders directing them to comply with Securities and Exchange Commission subpoenas for the production of documentary evidence and testimony. We consider the appeals together because the subpoenas relate to the same SEC investigation, the disputes concern many common facts, the appellants raise overlapping arguments, and the lawyers for the respective parties are the same.

Each appellant raises a procedural objection: Marin claims she was not subject to personal jurisdiction in the Southern District of Florida, while MinTrade argues the district court erred by refusing to hold an evidentiary hearing before enforcing the subpoena for MinTrade's documents. On the merits, both Marin and MinTrade say that the district courts should not have enforced the subpoenas because they were not relevant to a legitimate investigative purpose. After

2

thorough review, we are satisfied that in <u>Marin</u> the district court properly exercised personal jurisdiction, that in <u>MinTrade</u> the district court did not abuse its discretion in not holding an evidentiary hearing, and that neither district court abused its considerable discretion in concluding that the subpoenas were relevant to a legitimate investigation into possible violations of the Securities Exchange Act of 1934.  We affirm.

## I.

## A.

In November 2013, the Securities and Exchange Commission ("SEC") issued a formal order of investigation (the "FOI") directing an inquiry into a day-trading entity called Traders Café, a Tampa-based Florida limited liability company, and other unnamed entities.  The SEC had developed information tending to show that from at least late 2012, Traders Café may have engaged in unregistered broker-dealer conduct in the United States in violation of Section 15(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(a), as well as other securities law violations.  The FOI authorized the SEC to subpoena documents and testimony to determine whether Traders Café and its "officers, directors, employees, partners, subsidiaries, and/or affiliates, or other persons or entities," had violated Section 15(a) and other enumerated securities laws.  The FOI ordered that "a private investigation be made to determine whether any persons or entities

3

have engaged in, or are about to engage in, any of the reported acts or practices or any acts or practices of similar purport or object." This investigation led to administrative, civil, and criminal actions against the principals of Traders Café, which concluded by 2015.

The Traders Café investigation also led the SEC to another company, SureTrader, where Traders Café maintained a "master account." SureTrader is a Bahamian-based broker-dealer registered with the Securities Commission of the Bahamas. The SEC's Miami Regional Office continues to investigate whether SureTrader and its owner and CEO, Guy Gentile, committed or are committing violations of Section 15(a), since neither is registered with the SEC to act as a broker-dealer in the United States. The SEC further claims that "at least one-half of SureTrader's clients are United States residents and it employs more than fifty 'experienced employees,' servicing more than 20,000 clients, and processing over 12,000 trades per day."

The SEC's investigation led it to the appellants, Carla Marin and MinTrade. Marin is the owner and sole employee of Mint Custody Limited, a Delaware corporation in the business of asset custody. According to the SEC, SureTrader and Gentile transferred U.S. customer funds from overseas to a U.S. bank account belonging to Mint Custody. Marin then distributed these funds. Marin has lived in Putnam County, New York since the 1990s.

4

MinTrade is a Florida limited liability company based in West Palm Beach. The SEC says MinTrade provides "custom technologies for financial services, brokerage firms and trade desks." MinTrade is connected to SureTrader and Gentile through its registered agent Nicholas Abadiotakis. The SEC claims Abadiotakis is the trustee of a trust through which Gentile owns a majority interest in Stock USA Execution Services, LLC, an entity that clears trades for SureTrader. Abadiotakis's LinkedIn profile reveals that he has also been a trader for Stock USA. The SEC's lead investigator declared that there are confidential "additional connections" between MinTrade, SureTrader, and Gentile.

## B.

The procedural history surrounding Marin and MinTrade's challenges to the subpoenas is extensive but essential to understanding the resolution of these cases. We summarize it in some detail.

(1.) Marin. On September 1, 2017, the SEC issued a subpoena for Marin to appear for testimony in Miami, Florida later that month. And on December 6, 2017, the SEC also issued a subpoena for the production of documents. Marin's attorney claimed the subpoena had been improperly served, so the SEC served Marin again with another subpoena for documents on November 26, 2018. Both the testimony and documents subpoenas explained they were issued as part of the Traders Café investigation. The subpoena for documents sought information

5

regarding Mint Custody's formation, structure, and financial accounts, as well as documents, communications, and agreements between Mint Custody and SureTrader or Gentile.

Over the course of about a year, Marin stalled complying with the subpoenas. Marin failed to appear to testify, refused to testify absent a court order, rescheduled and cancelled her testimony, and then refused to appear at all and refused to produce any documents. In one illustrative episode, Marin initially agreed to testify in New York, and the SEC staff scheduled her testimony in New York City for November 9, 2017. At Marin's request, the SEC then rescheduled her testimony for November 20, 2017, and later for October 3, 2018, only for Marin to twice switch attorneys and ultimately refuse to comply with either subpoena. On February 6, 2019, having exhausted efforts to obtain Marin's testimony and the subpoenaed documents, the SEC applied to the district court in Miami for an order to show cause why Marin should not appear for testimony and produce documents, and for an order enforcing the subpoenas.

Marin opposed the enforcement of the SEC subpoenas, arguing, among other things, that the district court lacked personal jurisdiction over her and that the subpoenas were unenforceable because they lacked a sufficient nexus to the Traders Café FOI. At a March 19 hearing before a magistrate judge, the SEC presented testimony from Assistant Regional Director Jessica Weissman, who had

6

overseen the Traders Café investigation for more than four years.  Weismann testified that the subpoenas to Marin sought information that was "critical and necessary for the ongoing investigation."  On direct and cross examination, and in response to questioning by the court, Weismann explained the connections between Marin, Mint Custody, and the Traders Café investigation.  She asserted that Traders Café held a master account at SureTrader, that the investigation extended to SureTrader and Gentile's possible unregistered broker-dealer conduct, and that a review of Mint Custody's bank records suggested SureTrader had moved U.S. customer funds through Mint Custody's accounts.

The magistrate judge issued a Report and Recommendation ("R&R") concluding that the SEC had complied with all statutory and administrative requirements, that the information the subpoenas sought was relevant to the legitimate purpose of investigating whether SureTrader, Gentile, and others had engaged in unregistered broker-dealer conduct in violation of the Exchange Act of 1934, and that the court had personal jurisdiction over Marin.  The district court agreed and adopted the R&R on September 30, 2019.

(2.)  MinTrade.  On December 12, 2018, the SEC subpoenaed MinTrade for the production of documents related to Gentile, SureTrader, and SureTrader's affiliates.  The subpoena said that it was related to the Traders Café investigation and sought documents concerning the relationship between MinTrade, Gentile, and

SureTrader; correspondence between MinTrade, Gentile, and SureTrader; and documents concerning MinTrade's formation, business nature, and bank accounts. MinTrade informed the SEC that it would not voluntarily comply with the subpoena.

On February 6, 2019, the same day it sought to enforce the <u>Marin</u> subpoenas, the SEC applied to the district court for an order to show cause why MinTrade should not produce documents and for an order enforcing the subpoena. MinTrade opposed, reprising Marin's arguments, including that MinTrade's documents were not sufficiently relevant to the Traders Café FOI. (MinTrade did not, however, contest personal jurisdiction.) Afterwards, the SEC filed a declaration from Weismann in support of its application. On April 4, 2019, Gentile moved to intervene. His motion attached the transcript of the earlier <u>Marin</u> hearing, making Weismann's <u>Marin</u> testimony part of the record in MinTrade's case. The district court denied Gentile's motion.

On July 8, 2019, without holding a hearing, a magistrate judge issued an R&R recommending that the district court grant the SEC's application and enforce the subpoena. The judge found that even though the connections between MinTrade and SureTrader may have been "tenuous," the requested documents were relevant to the SEC's investigation into whether Gentile and SureTrader had

8

engaged in unregistered broker-dealer conduct in violation of the Exchange Act of 1934.

On November 8, 2019, without first conducting an evidentiary hearing, but after "independently review[ing] the Report, the record, [MinTrade's] objections [to the R&R] and [the SEC's] response, and applicable case law," the district court adopted the R&R. The court also granted the SEC's application for a show cause hearing. At the hearing, MinTrade's counsel argued for the first time that United States v. Powell, 379 U.S. 48 (1964), required the court to hold an evidentiary hearing to ensure that there was a sufficient nexus between MinTrade and the Traders Café FOI. The district court asked whether MinTrade had sought a hearing from the magistrate judge, observing that, "if you have not asked for one then I think that ship has sailed." Counsel for the SEC explained that MinTrade had not requested a hearing, but added that the Weismann declaration could serve as a basis for the factual findings in the R&R. After the hearing, the court issued still another order affirming and adopting the magistrate judge's R&R.

These timely appeals followed.

II.

We discuss Marin's personal jurisdiction argument first and then turn to the claims that the subpoenas are not relevant to a legitimate investigative purpose.

We review a district court's order concerning personal jurisdiction de novo. Managed Care Advisory Grp., LLC v. CIGNA Healthcare, Inc., 939 F.3d 1145, 1153 (11th Cir. 2019) (citation omitted).  In order to answer this question, "we first determine whether the applicable statute potentially confers jurisdiction over the defendant, and then determine whether the exercise of jurisdiction comports with due process."  Republic of Panama v. BCCI Holdings (Luxembourg) S.A., 119 F.3d 935, 942 (11th Cir. 1997).

A.

As for the first issue (the statutory basis for personal jurisdiction), "[w]hen a federal statute provides for nationwide service of process, it becomes the statutory basis for personal jurisdiction" over a person served according to the statute. Id.; see also SEC v. Carrillo, 115 F.3d 1540, 1543 (11th Cir. 1997) ("[S]ervice of process constitutes the vehicle by which the court obtains jurisdiction.") (quotation marks omitted).  Here, the SEC initiated the subpoena enforcement proceeding pursuant to a statute that provides for nationwide service of process, 15 U.S.C. § 78u(c): when a person refuses to obey an SEC subpoena, the SEC "may invoke the aid of any court of the United States within the jurisdiction of which [its]

investigation . . . is carried on," and may serve process on the target of the subpoena "in the judicial district whereof such person is an inhabitant or wherever he may be found." 15 U.S.C. § 78u(c); see also Carrillo, 115 F.3d at 1544 & n.4 (noting that federal securities laws that similarly authorize service of process in any district "of which the defendant is an inhabitant or wherever the defendant may be found" provide for nationwide service of process). The SEC served Marin at her New York address. The SEC nationwide service of process statute provides a basis for personal jurisdiction over Marin.

B.

As for the second question (due process), "when, as here, a federal statute provides the basis for jurisdiction, the constitutional limits of due process derive from the Fifth, rather than the Fourteenth, Amendment." BCCI Holdings, 119 F.3d at 942. "The exercise of personal jurisdiction comports with due process when (1) the nonresident defendant has purposefully established minimum contacts with the forum and (2) the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice." Carrillo, 115 F.3d at 1542 (quotation marks omitted) (alteration accepted).

The Fifth Amendment's Due Process Clause, like the Fourteenth's, is "designed to protect individuals by providing them with fair notice that their activities will render them liable to suit in a particular forum." BCCI Holdings,

11

119 F.3d at 945 (citation omitted). "This fair warning requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum." Id. (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)) (internal quotation marks omitted) (alterations accepted). To determine whether a person has purposefully directed activities at the forum, we ask whether the individual has sufficient "minimum contacts" with the forum. See, e.g., Carillo, 115 F.3d at 1542. Where, as here, the Fifth Amendment applies because personal jurisdiction is based on a federal statute authorizing nationwide service of process, "the applicable forum for minimum contacts purposes is the United States," not the state in which the district court sits. Id. at 1544; BCCI Holdings, 119 F.3d at 945 n.16, 946–47, 946 n.21 ("Because minimum contacts with the United States -- the relevant sovereign -- satisfy the 'purposeful availment' prong in federal question cases, contacts with the forum state are not constitutionally required."). Thus, a United States resident or business, which necessarily has "directed . . . activities at the United States" "through [her] choice of residence or incorporation," satisfies the purposeful availment component of Fifth Amendment due process analysis. BCCI Holdings, 119 F.3d at 945 n.16.

Marin is a United States citizen who lives in New York. She is the owner and sole employee of Mint Custody, a Delaware corporation. She has purposely directed activities at the United States, including activities relevant to the SEC's

subpoenas (SureTrader and Gentile transferred U.S. customer funds from overseas to Mint Custody's U.S. bank account; Marin signed for these transactions, and distributed funds in the United States).  Marin's contacts with the United States easily satisfy the purposeful availment requirement.

That does not end our analysis: "A defendant's 'minimum contacts' with the United States do not . . . automatically satisfy the due process requirements of the Fifth Amendment."  Id. at 947.  "Once it has been established that a defendant has purposefully directed his activities at a particular forum, courts still should determine if the assertion of personal jurisdiction would comport with fair play and substantial justice."  Id. at 945 (internal quotation marks omitted) (quoting Burger King, 471 U.S. at 476).  In order to apply these considerations in the Fifth Amendment context, we ask first whether the party challenging jurisdiction has "presented a compelling case" that the exercise of jurisdiction would be so unreasonable that the party's "liberty interests have actually been infringed."  Id. at 946 (citations omitted) (alteration accepted).  If, and only if, the challenging party has made this showing, we proceed to "balance the burdens imposed on the individual defendant against the federal interest involved in the litigation."  Id.

Marin has not established that litigating the enforcement of these subpoenas in the Southern District of Florida would pose a "constitutionally significant inconvenience" that would infringe her liberty interests.  Id.  To be sure, "[t]here

13

are circumstances, although rare, in which a defendant may have sufficient contacts with the United States as a whole but still will be unduly burdened by the assertion of jurisdiction in a faraway and inconvenient forum." Id. at 947. Thus, "even when a defendant resides within the United States, courts must ensure that requiring a defendant to litigate in [the] plaintiff's chosen forum is not unconstitutionally burdensome." Id. Still, "it is only in highly unusual cases that inconvenience will rise to a level of constitutional concern." Id. "The burden is on the defendant to demonstrate that the assertion of jurisdiction in the forum will make litigation so gravely difficult and inconvenient that [she] unfairly is at a severe disadvantage in comparison to [her] opponent." Id. at 948 (quotation marks omitted).

Marin has not come close to meeting this substantial burden. Marin says that she has no contacts with Florida and lives some 1,300 miles from Miami, where the district court sits. This argument misses the mark, for "a defendant's contacts with the forum state play no magical role in the Fifth Amendment analysis." Id. at 946; see also id. at 948 (where defendants had conducted business throughout the eastern seaboard, "[t]he fact that they may not have had significant contacts with Florida [was] insufficient to render Florida an unreasonably inconvenient forum.").

14

Moreover, Marin has not presented any reason to believe that responding to the subpoena in Miami would impose a constitutionally significant burden. "There is nothing inherently burdensome about crossing a state line." Id. at 946 (quoting Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, Civil 2d § 1067.1, at 327 (1990)). Even in 1988, we observed that "[m]odern means of communication and transportation have lessened the burden of defending a lawsuit in a distant forum." In re Chase & Sanborn Corp., 835 F.2d 1341, 1346 (11th Cir. 1988), rev'd on other grounds sub nom. Granfinanciera, S.A. v. Nordberg, 492 U.S. 33 (1989). Even more so today. The airports serving metropolitan New York dispatch many hundreds of flights a day to Florida, more than 200 to Miami alone. Flying to Florida is no more unusual in New York than following Duke Ellington's famous counsel to take the A train.

What's more, contesting a subpoena does not present the same burden as defending a full-scale trial proceeding. Complying with the subpoenas would be less burdensome still. Indeed, in this case, Marin need not travel at all to comply with the document subpoena; all she must do is arrange for delivery of the relevant documents to the SEC's Washington, DC office. Moreover, she may not have to travel to Miami in order to comply with the subpoena for her testimony, since the SEC previously expressed willingness to take her testimony in New York City, some 60 miles from her home in Putnam County. But even if the SEC were to

15

require her presence in Miami, Miami is a short direct flight from New York City's airports. Any trip likely would not require a lengthy stay: each time the SEC previously proposed a schedule for Marin's testimony, the schedule contemplated only one day of testimony.

In short, Marin has not presented any evidence, much less "a compelling case," that contesting or complying with the subpoenas would present a "constitutionally significant inconvenience." BCCI Holdings, 119 F.3d at 946 (quotation marks omitted). We, therefore, need not balance any burden on Marin against the federal interest in proceeding in the Southern District of Florida. Id. at 948.

In any event, however, contrary to Marin's suggestion, the SEC's decision to proceed in the Southern District of Florida was hardly "unreasonable" or "arbitrary." The SEC is free to enforce its subpoenas by invoking the "aid of any court of the United States within the jurisdiction of which [its] investigation or proceeding is carried on . . . ." 15 U.S.C. § 78u(c) (emphasis added). The SEC has conducted the Traders Café investigation out of its Miami office, where it is investigating the United States activities of a Bahamian entity (SureTrader) and its owner and CEO, a resident of Puerto Rico. The investigation also extends to entities based in Tampa and West Palm Beach (Traders Café and MinTrade). The Southern District of Florida is a logical place to center the investigation.

16

The district court's exercise of personal jurisdiction was proper.

III.

Moreover, the district courts did not abuse their discretion in enforcing the subpoenas to Marin and to MinTrade.

We review de novo "whether an agency had authority to issue an administrative subpoena and a district court's interpretation and application of" relevant statutes. Managed Care Advisory Grp., 939 F.3d at 1153; see also United States v. Fla. Azalea Specialists, 19 F.3d 620, 622 (11th Cir. 1994). But we review a district court's decision to enforce a subpoena only for abuse of discretion. See McLane Co. v. EEOC, 137 S. Ct. 1159, 1167 (2017), as revised (Apr. 3, 2017); Managed Care Advisory Grp., 939 F.3d at 1153. "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous." United States v. Estrada, 969 F.3d 1245, 1261 (11th Cir. 2020) (quotation omitted).

 "A district court's role in a proceeding to enforce an administrative subpoena is limited." EEOC v. Tire Kingdom, Inc., 80 F.3d 449, 450 (11th Cir. 1996). To obtain judicial enforcement of an administrative subpoena, an agency such as the SEC must establish four things: "[1] that the investigation will be conducted pursuant to a legitimate purpose, [2] that the inquiry may be relevant to

17

the purpose, [3] that the information sought is not already within the [agency's] possession, and [4] that the administrative steps required . . . have been followed . . . ." Powell, 379 U.S. at 57–58 (applying these criteria to an IRS summons); United States v. Clarke, 573 U.S. 248, 250 (2014) (same); see, e.g., RNR Enters., Inc. v. SEC, 122 F.3d 93, 96 (2d Cir. 1997) (applying the Powell requirements to SEC subpoenas); cf. SEC v. Jerry T. O'Brien, Inc., 467 U.S. 735, 749 (1984) (assuming arguendo that the target of an SEC investigation has a right to be investigated in a manner consistent with the Powell standards).

All the agency must do in the first instance is make out a prima facie showing that the Powell criteria are met. See United States v. Centennial Builders, Inc., 747 F.2d 678, 680 (11th Cir. 1984); United States v. Transocean Deepwater Drilling, Inc., 767 F.3d 485, 489 (5th Cir. 2014) ("The Government bears the initial burden to show that the criteria have been met, although the burden to make a prima facie case is minimal.") (internal quotation marks omitted). The agency can accomplish this through an investigator's affidavit. See Clarke, 573 U.S. at 250, 254; In re McVane, 44 F.3d 1127, 1136 (2d Cir. 1995) ("An affidavit from a government official is sufficient to establish a prima facie showing that these requirements [of relevance to the general purposes of the agency's investigation] have been met."). "Once the government makes this preliminary showing, the burden shifts to the [subpoena recipient] to disprove one of the four Powell criteria,

18

or to demonstrate that judicial enforcement should be denied on the ground that it would be an abuse of the court's process." Centennial Builders, Inc., 747 F.2d at 680 (quotation marks omitted); see also Clarke, 573 U.S. at 254.

On appeal, Marin and MinTrade challenge the district courts' holdings on the first and second Powell requirements, claiming that the investigation was not conducted for a legitimate purpose and the subpoenas were not relevant to any such purpose. Powell, 379 U.S. at 57.

## A.

The SEC issued the Marin and MinTrade subpoenas pursuant to a legitimate investigative purpose. The SEC enjoys broad, discretionary power to investigate past, ongoing, or imminent violations of the Exchange Act. 15 U.S.C. § 78u(a)(1); 17 C.F.R. § 202.5(a); see also Fla. Azalea Specialists, 19 F.3d at 622 (noting the "broad investigatory power of administrative agencies"). The SEC's investigatory power is analogous to the power of a grand jury, "which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." Id. (quoting United States v. Morton Salt Co., 338 U.S. 632, 642–43 (1950)). This power is not without limits: "a governmental investigation . . . may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power." Morton Salt Co., 338 U.S. at 652 (citation omitted).

19

Still, "it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." Id.; Tire Kingdom, Inc., 80 F.3d at 450.

Marin and MinTrade attack the legitimate purpose of the subpoenas by disputing the scope and validity of the Traders Café FOI. They claim that "the SEC only has subpoena authority pursuant to a formal investigation" and that "the only legitimate purpose of an SEC investigative subpoena is that it is relevant to the matter contained in a formal investigative order." They insist that the terms of the Traders Café FOI do not extend so far as to authorize the investigation of SureTrader and Gentile. Thus, Marin and MinTrade say the subpoenas they received -- which seek information about SureTrader and Gentile, not Traders Café or its direct affiliates -- are beyond the scope of the FOI, and therefore lack a legitimate purpose. Marin and MinTrade also argue that the Traders Café FOI is too old to justify an ongoing investigation and is therefore invalid. MinTrade claimed in district court that this proceeding "appears to be a mere pretext to dig into the affairs of anyone connected to Gentile, rendering [it] abusive and improper."

### 1. Scope of the Traders Café FOI

For starters, Marin and MinTrade read the FOI too narrowly. The Traders Café FOI broadly directed that "a private investigation be made to determine

whether any persons or entities have engaged in, or are about to engage in, any of the reported acts or practices [including unregistered broker-dealer activity] or any acts or practices of similar purport or object."

Moreover, the FOI's terms extend to SureTrader and Gentile.  The SEC's investigative powers are not limited to the specific entities named in a formal order.  See Jerry T. O'Brien, Inc., 467 U.S. at 749 ("The SEC often undertakes investigations into suspicious securities transactions without any knowledge of which of the parties involved may have violated the law."); RNR Enters., Inc., 122 F.3d at 98 (statutes and regulations governing the SEC do not "require that the order authorizing the investigation target by name a specific company or person suspected of violating securities laws").

Thus, the FOI authorizes investigation into whether Traders Café and its "officers, directors, employees, partners, subsidiaries, and/or affiliates, or other persons or entities" violated or are about to violate the prohibition on unregistered broker-dealer activity.  The Traders Café investigation led the SEC to SureTrader, where Traders Café maintained a "master account."  The SEC discovered that SureTrader is a Bahamian broker-dealer and that neither SureTrader nor its owner and CEO Gentile are registered as broker-dealers in the United States.  Yet at least half of SureTrader's clients are United States residents.  So the SEC began investigating whether SureTrader and Gentile were engaged in unregistered

21

broker-dealer business in the United States.  The scope of the SEC's investigation includes "whether [SureTrader's] customers include United States residents, the solicitation of U.S. customers, and the movement of customer funds."  SureTrader and Gentile are "other persons or entities" that the SEC may investigate for unregistered broker-dealer activity under the terms of the FOI.

MinTrade argues nevertheless that the FOI cannot apply to MinTrade because MinTrade "did not even exist at the time [the Traders] Café FOI was issued" (the SEC issued the FOI in 2013; MinTrade incorporated in 2017).  But "there is no requirement that the scope of the investigation be limited to companies that existed before the Formal Order was issued where . . . the Formal Order expressly provide[s] that the investigation would encompass persons who 'are about to engage' in the alleged acts, and the Order remained in effect at the time the subpoenas were issued."  RNR Enters., Inc., 122 F.3d at 98.  Here, the Traders Café FOI states that it applies to persons or entities who "are about to engage in" enumerated securities violations, including unregistered broker-dealer conduct.  Congress's broad grant of investigative authority to the SEC does not contemplate a game of cat and mouse whereby the SEC must issue another formal order of investigation each time an investigation yields a new lead.

Marin and MinTrade further claim that relying on Traders Café's maintenance of a master account at SureTrader in order to establish a nexus

22

between Traders Café, SureTrader, Marin, and MinTrade would sanction the issuance of subpoenas to any of SureTrader's "20,000+ clients" and anyone connected to any of those "20,000+ clients."  But none of this has happened here.  The SEC has reason to believe that SureTrader engaged in the very conduct -- unregistered broker-dealer business -- that the Traders Café FOI authorized the SEC to investigate.  Both Marin and MinTrade at least arguably are tied to this activity in ways SureTrader's run of the mill clients likely are not.  SureTrader and Gentile used Marin's firm to move customer money from overseas into the United States, and MinTrade's registered agent is the trustee of the trust through which SureTrader's owner and CEO owns another firm that cleared trades for SureTrader.  Furthermore, the breadth of an SEC investigation does not alone render it invalid.  Cf. RNR Enters., Inc., 122 F.3d at 97 (Statutes and regulations governing the SEC "do not preclude an industry-wide administrative investigation of possible securities law violations where, as set forth in the Formal Order, information before the SEC shows that violations of federal securities laws may have occurred on an industry-wide basis").

 2.  *Age of the Traders Café FOI*

Marin and MinTrade also claim that the subpoenas are not tied to a legitimate investigative purpose because the 2013 Traders Café FOI is subject to a five-year "durational limit" based on the provision found in 28 U.S.C. § 2462 that

"an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued . . . ."  In Gabelli v. SEC, the Supreme Court held that an SEC claim for a civil monetary penalty accrues for § 2462 purposes at the time of a defendant's securities law violation, rather than at the time the SEC discovers the violation.  568 U.S. 442, 448–54 (2013).  Since an SEC penalty action based on violations that had occurred by the time of the 2013 Traders Café FOI would be time-barred under Gabelli, Marin and MinTrade reason that the Traders Café FOI is "invalid" and cannot supply a legitimate purpose for the SEC's subpoenas.

This argument overlooks two basic points.  First, § 2462 does not apply to these proceedings.  A proceeding to enforce a subpoena is not "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise."  28 U.S.C. § 2462.  This much is clear from the text, and from the Supreme Court's guidance that "penalt[ies]" in this context include only remedies, such as disgorgement, that "go beyond compensation, are intended to punish, and label defendants wrongdoers."  See Kokesh v. SEC, 137 S. Ct. 1635, 1643 (2017) (quoting Gabelli, 568 U.S. at 451–52).  The enforcement of a subpoena does no such thing.  See Jerry T. O'Brien, Inc., 467 U.S. at 741 ("Subpoenas issued by the [SEC] are not self-enforcing, and the recipients thereof are not subject to penalty

24

for refusal to obey."). Perhaps a contempt citation for failing to obey a court order requiring compliance with an SEC subpoena would be a "penalty" within the ambit of § 2462. But we need not decide this issue, because the SEC has not sought the sanction of contempt in this case. Nor has it sought any civil fine, penalty, or forfeiture. All it has asked for is an order from the district court enforcing its subpoenas. Moreover, even were § 2462 to apply to these subpoena enforcement proceedings, its limitation period would not have run. The SEC brought the enforcement actions in 2019, not long after it issued the subpoenas in 2017 and 2018, and surely within the five-year window prescribed in § 2462.

Second, even setting aside that § 2462 does not apply to these proceedings, that a statute of limitations might bar some enforcement actions related to an FOI does not render the FOI invalid. The FOI here notes that Traders Café or other persons or entities "may have been or may be" engaging in unregistered broker-dealer activity. So possible violations may have continued well past 2013; indeed, they may still be ongoing. A recent violation could touch off a timely enforcement proceeding. And should the SEC discover some violation that occurred more than five years ago, the SEC could seek a remedy not subject to the § 2462 time limit, such as injunctive relief, which in some circumstances does not amount to a "penalt[y] within the meaning of § 2462." SEC v. Graham, 823 F.3d 1357, 1362 (11th Cir. 2016); see also SEC v. Gentile, 939 F.3d 549, 556 (3d Cir. 2019), cert.

25

denied, 140 S. Ct. 2669 (2020).  Simply put, § 2462 does not at the outset block the SEC from reasonably inquiring whether there are violations for which timely remedies may be available.

The FOI remains valid, and it supplies a legitimate purpose for the subpoenas issued to Marin and MinTrade.

### B.

Marin and MinTrade argue still further that the district courts erred in finding the subpoenaed information relevant to the investigation into SureTrader and Gentile.

"The measure of relevance used in [administrative] subpoena enforcement actions is quite broad."  Fla. Azalea Specialists, 19 F.3d at 624; see also Sandsend Fin. Consultants, Ltd. v. Fed. Home Loan Bank Bd., 878 F.2d 875, 882 (5th Cir. 1989) (an administrative subpoena will survive a relevancy challenge so long as it "touches a matter under investigation") (quotation marks omitted); 15 U.S.C. § 78u(c) (SEC may invoke the aid of a district court to enforce a subpoena, and the court may order production of records or testimony "touching the matter under investigation or in question").  The relevance assessment is "well suited to a district judge's expertise."  McLane Co., 137 S. Ct. at 1167.  Where, as here, the question of relevance "is essentially a factual determination concerning the interrelation or lack thereof of different groups of facts, we must uphold the district

26

court's determination unless it is clearly erroneous."  EEOC v. Packard Elec. Div., Gen. Motors Corp., 569 F.2d 315, 318 (5th Cir. 1978)[1]; see also RNR Enters., Inc., 122 F.3d at 97.

As we have explained, the SEC bears only a minimal burden of presenting a prima facie case that its subpoenas satisfy each Powell factor, including the relevance factor.  See Centennial Builders, Inc., 747 F.2d at 680.  An agency affidavit may be sufficient to meet this burden.  See Clarke, 573 U.S. at 250, 254; McVane, 44 F.3d at 1136.

In Marin, the magistrate judge relied on the exhibits attached to the SEC application and on Assistant Regional Director Weismann's testimony.  Where an affidavit suffices, so too does sworn hearing testimony subject to cross examination.  And Weismann's testimony supported the allegations in the SEC's application.  Weismann testified that her investigation had revealed that SureTrader and Gentile deposited U.S. customer funds from overseas into Mint Custody's account, funds Marin then distributed -- the subpoenas to Marin were therefore "critical" to the SEC's investigation of whether SureTrader and Gentile were unlawfully soliciting U.S. customers.

---

[1] Decisions the former Fifth Circuit issued prior to the close of business on September 30, 1981 are binding on this Court.  See Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

For MinTrade's part, the record before the district court included both the transcript of Weismann's <u>Marin</u> testimony and Weismann's written declaration filed under penalty of perjury.[2]  Weismann stated in her declaration that MinTrade's registered agent, Nicholas Abadiotakis, is the trustee of a trust through which Gentile owned a majority interest in Stock USA, a "Gentile affiliate" that cleared trades for SureTrader (Abadiotakis was also a trader at Stock USA).

In light of Weismann's account, the subpoenas made sense.  While the document subpoenas seek general information about Mint Custody and MinTrade's businesses, they also ask for specific information about their relationships to SureTrader and Gentile, the current subjects of the SEC's investigation (the subpoena for Marin's testimony does not specify subject matter).  The Marin documents subpoena requests communications concerning Mint Custody by, to, or including SureTrader and Gentile, and the MinTrade subpoena

---

[2] While MinTrade is correct that these papers were not in the record when MinTrade filed its opposition to the SEC application, they were part of the record by the time the magistrate judge issued the R&R and when the district court affirmed and adopted the recommendation to grant the SEC's application for an order to show cause.  MinTrade could have responded to Weismann's testimony and declaration when it objected to the R&R (indeed, the SEC cited both documents in its response to MinTrade's objections).  When the district court adopted the R&R, it had "independently reviewed the Report, the record, the objections and response, and applicable case law."  The district court also granted a show cause hearing, at which the SEC specifically referenced the sworn declaration in support of the application and argued that it supported the R&R's findings.

requests documents "concerning the relationship between [MinTrade] and SureTrader."

The information the SEC requested from Marin and MinTrade was relevant to SureTrader's and Gentile's potential unregistered broker-dealer conduct. In turn, the investigation into SureTrader and Gentile was a part of the investigation the Traders Café FOI authorized. The SEC adduced sufficient evidence to make a prima facie showing of relevance, and the district courts did not clearly err in finding the SEC had done so.

C.

Finally, MinTrade argues that the district court should have required the SEC to prove compliance with the Powell criteria at an evidentiary hearing. Unlike in Marin, Weismann did not testify in court in MinTrade. But the decision whether to hold an evidentiary hearing in an administrative subpoena enforcement proceeding is well within the discretion of the district court, and the district court did not abuse that discretion here.

Administrative subpoena enforcement proceedings are "summary in nature." Clarke, 573 U.S. at 254 (quotation omitted). And an agency can establish compliance with Powell by submitting an affidavit; once it has done so, the burden shifts to the party challenging the subpoena to disprove compliance with one of the Powell criteria. See id. at 250; Centennial Builders, Inc., 747 F.2d at 680. Thus, in

29

<u>Clarke</u>, the Supreme Court rejected a categorical requirement that a district court give a taxpayer challenging an IRS summons under <u>Powell</u>'s legitimate purpose requirement an opportunity to question the IRS agents about their motives. 573 U.S. at 255. Instead, the Court held that once the IRS had established prima facie compliance with <u>Powell</u>, the taxpayer could obtain a hearing only by "point[ing] to specific facts or circumstances plausibly raising an inference of bad faith." <u>Id.</u> at 254. "[B]are assertion or conjecture is not enough." <u>Id.</u> The Court also emphasized that the decision whether to permit examination was within the district court's discretion, which "reflects the district court's superior familiarity with, and understanding of, the dispute." <u>Id.</u> at 256; <u>see also</u> <u>SEC v. Knopfler</u>, 658 F.2d 25, 26 (2d Cir. 1981) ("[I]t is within the discretion of the district court to determine whether or not an evidentiary hearing is required" in an SEC subpoena enforcement proceeding).[3]

Here, the district court acted within its discretion to deny an evidentiary hearing. MinTrade did not point to specific facts plausibly raising an inference

---

[3] The Third and Ninth Circuits have said district courts must hold evidentiary hearings in SEC subpoena enforcement proceedings, but these decisions are in tension with the Supreme Court's more recent guidance in <u>Clarke</u>. <u>See</u> <u>SEC v. Wheeling-Pittsburgh Steel Corp.</u>, 648 F.2d 118, 128 (3d Cir. 1981); <u>Jerry T. O'Brien, Inc. v. SEC</u>, 704 F.2d 1065, 1067 (9th Cir. 1983), <u>rev'd on other grounds,</u> 467 U.S. 735 (1984).

that the SEC did not comply with one of the two <u>Powell</u> factors MinTrade

challenged -- a legitimate investigative purpose and relevance to that purpose.[4]

As for the issue of relevance, MinTrade made no factual claims of its own in

district court; rather it argued that the SEC lacked evidence to support its case for

relevance and that the terms of the FOI did not extend to MinTrade.  But an

evidentiary hearing was not necessary to determine whether the SEC met its prima

facie <u>Powell</u> burden.  The district court was presented with the Weissman

declaration and Weissman transcript.  As for a legitimate purpose, MinTrade relies

on the same legal arguments it offered about the scope and validity of the FOI, and

the conclusory claim that the SEC's investigation was a "pretext to dig into the

affairs of anyone connected to Gentile, rendering this present Application abusive

and improper."  In the absence of anything specific to rebut the SEC's prima facie

<u>Powell</u> showing, the district court acted within its "broad discretion to determine"

that no evidentiary hearing was required.  See <u>Clarke</u>, 573 U.S. at 256.  This is

especially so where MinTrade also had the opportunity to make its case at a show

---

[4] We can discern no reason why the Supreme Court's rationale in <u>Clarke</u> regarding the legitimate purpose requirement should not also apply to other <u>Powell</u> criteria.  MinTrade attempts to distinguish <u>Clarke</u> on the ground that the respondent there challenged enforcement of the summons based on alleged IRS "ulterior motive[s]."  573 U.S. at 251 (quotation omitted).  [But of course, MinTrade also imputes to the SEC the improper motive of pretextually "dig[ging] into the affairs of anyone connected to Gentile."  And <u>Clarke</u>'s reasoning applies with equal force to MinTrade's other objection, to the relevancy of the subpoenas: absent any specific factual or circumstantial assertions that cast doubt on relevance -- that is, absent a conflict of evidence to resolve -- the district court had no reason to hold an evidentiary hearing.

cause hearing. In fact, MinTrade did not even request an evidentiary hearing until the show cause hearing, well after briefing before the magistrate judge and after the district court's first order adopting the magistrate judge's R&R.

***

In short, based on our review of the entire record, we have little difficulty affirming the district courts' orders requiring Marin and MinTrade to comply with the subpoenas.

**AFFIRMED.**