[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-10779

_____

D.C. Docket No. 0:19-cv-61555-AHS


DON'T LOOK MEDIA LLC,
a Delaware Limited Liability Company,

                                        Plaintiff - Appellant,

versus

FLY VICTOR LIMITED,
a company incorporated under the Laws
of England and Wales,
ALYSSUM GROUP LIMITED,
a company incorporated under the Laws
of England and Wales,
ALYSSUM HOLDINGS LIMITED,
a company incorporated under the Laws
of England and Wales,
CLIVE HENRY JACKSON,
an individual,
BERNARDUS VORSTER,
an individual,
DAN NORTHOVER,
an individual,
JOHN DOE(S),
an unknown person(s)/corporation(s),

                                        Defendants - Appellees.

—————————————————

Appeal from the United States District Court
for the Southern District of Florida

—————————————————

(June 4, 2021)

Before JILL PRYOR, NEWSOM, and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

This dispute concerns a deal gone bad. Plaintiff Don't Look Media, LLC ("DLM") licensed its private jet booking website to defendant Fly Victor Ltd. in exchange for Fly Victor's agreement to invest in increasing traffic to the site and to share booking revenues with DLM. According to DLM, Fly Victor didn't do any of that, and never intended to. DLM sued Fly Victor, some of its directors and officers, and related entities in the Southern District of Florida. Among other things, DLM alleged that the directors and officers had violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") by defrauding DLM of the site revenues and laundering these ill-gotten gains through closely held firms. The district court dismissed the case for a lack of personal jurisdiction and because the revenue sharing agreement's forum selection clauses mandated litigation of the dispute in an English court.

We affirm for two independently sufficient reasons. First, for a statutory basis for personal jurisdiction, DLM relies only on a RICO provision that allows

2

for service of process in any United States judicial district.  But this statute cannot provide personal jurisdiction because DLM did not serve any party within the United States.  It only attempted service on the defendants in a London office building.  Moreover, the forum selection clauses are enforceable, plainly apply to DLM's claims, and require dismissal in favor of an English forum.

I.

A.

Broward County, Florida-based Don't Look Media, LLC owns PrivateJet.com, a website booking platform for private jet operators.  Customers use the website to arrange and book flights with individual providers.  As of July 2015, DLM was licensing the PrivateJet platform to Jetsmarter.com, a private jet services broker and a competitor of defendant Fly Victor Ltd. ("Fly Victor").  Fly Victor is a London, England-based private jet and air charter broker that develops websites and mobile applications to reach clients looking to charter private jets.

DLM grew dissatisfied with Jetsmarter and retained Nelson Rocha as a consultant to explore the possibility of partnering PrivateJet.com with an alternative company.  Rocha reached out to Fly Victor with a proposal for Fly Victor to develop and manage the PrivateJet domain and to share the resulting revenues with DLM.  In July 2015, DLM and Fly Victor executed a Revenue Sharing Agreement ("RSA").  The RSA assigned to Fly Victor "the exclusive

license and rights to design, manage, build and operate PrivateJet" for three years. In exchange, Fly Victor agreed "to design and build PrivateJet by continuously adding content and search engine optimization on both a newly-developed landing page and website, which would include a state-of-the-art booking platform." Fly Victor promised it would perform according to "Good Industry Practice" and in compliance with Federal Aviation Administration and United States Department of Transportation regulations. Fly Victor also agreed to invest in PrivateJet's revenue generation potential: "it would spend at least [$2,500.00] per month on Google Pay-Per-Click advertising starting" in November 2015. Finally, Fly Victor agreed to share with DLM forty percent of the gross profits from initial bookings on PrivateJet and ten percent of the gross profits from all subsequent bookings. But if site revenues did not reach certain monthly minimum targets, Fly Victor would instead pay DLM $2,500 per month beginning in the sixth month of the contract. This figure increased to $5,000 per month beginning in the twenty-fifth month of the contract.

A seemingly straightforward business arrangement. But according to DLM, all was not as it appeared. DLM claims that some of the defendants -- Fly Victor CEO and Director Clive Henry Jackson, Fly Victor Accountant and Principal Director Bernardus Vorster, Fly Victor Chief Marketing Officer Dan Northover, and unknown John Doe insider investors in Fly Victor -- "collaborated prior to and

4

during the drafting of the RSA for purposes of defrauding [DLM] as these [d]efendants had no intention of Fly Victor honoring any of its obligations under the RSA." The RSA was a "fraudulent inducement for [DLM] to license PrivateJet to . . . Fly Victor."

This scheme included the addition of allegedly unnegotiated venue and choice of law clauses intended to "make it difficult or impossible for [DLM] to enforce its rights once the fraud was discovered." These clauses read:

> 13. **CHOICE OF LAW**
>
> 13.1 This Agreement, and any issues or disputes arising out of or in connection with it (whether such disputes are contractual or non-contractual in nature, such as claims in tort, for breach of statute or regulation or otherwise) shall be governed by and construed in accordance with English law and the parties hereby submit to the exclusive jurisdiction of the English Courts.
>
> . . .
>
> 22. **LAW AND JURISDICTION**
>
> . . .
>
> 22.2 The courts of England shall have exclusive jurisdiction to adjudicate any dispute which arises out of or in connection with this Participation Agreement, provided that Victor shall be entitled to take proceedings relating to this Participation Agreement in any other jurisdiction.[1]

In December 2017, defendants Alyssum Group and Alyssum Holdings were formed as Fly Victor's parent corporations, allegedly in order to defraud DLM and others by hiding Fly Victor's revenues.

---

[1] The term "Participation Agreement," which does not appear elsewhere in the contract, seems to be simply a reference to the RSA.

5

Early on, the contractual relationship seemed to be going well. In September 2015, Jackson emailed DLM's sole member Louis Spagnuolo that he believed the project was "all in hand" and indicated that Northover was responsible for the PrivateJet project. In November, a DLM representative emailed Northover "to see how things were progressing." Northover responded that his team had "started organically rebuilding traffic to the site," and provided some detail on site visit numbers and the sources of the visits. He was optimistic about increasing traffic: "There are some big gains to be made in organic traffic and once the latest product iterations are in place, we should start work on improving our [search engine optimization] and introducing paid search campaigns." Though traffic was "small numbers right now," Northover was "confident [it would] build up over the coming weeks."

According to DLM, this update was misleading. Northover had no reason to believe "big gains" were on the way because Fly Victor was not investing in generating site traffic -- contrary to its contractual promise. Spagnuolo sent other emails from July 2015 to August 2018 inquiring about the status of payments Fly Victor owed DLM, but "never seemed to get a straight answer." On July 25, 2018, Spagnuolo called Northover and told him that DLM "had not been paid for any lead generations for three years" and that he believed "Fly Victor was in material

6

breach of the RSA." In response, Northover stated that "he had not been able to get management's full backing for the project."

The RSA's thirty-six-month term expired on July 4, 2018, and Fly Victor notified DLM that it was not interested in renewing the agreement. DLM alleges that on August 21, 2018, Alyssum Group's "lawyer Stephen Jones wrote DLM an email on behalf of . . . Fly Victor which stated -- falsely -- that DLM allegedly failed to complain about not getting paid during the term of the RSA" and that DLM's "claims for breach of contract were [therefore] non-existent."

DLM claims that even though PrivateJet "created multi-million-dollar revenues" for Fly Victor, DLM "has not received one dollar in remunerations from these revenues as required by the RSA." However, Fly Victor did make at least some payments to DLM. Spagnuolo -- DLM's sole member -- said in an affidavit that from 2016 through 2018, "DLM received wire transfers from [Fly Victor's] U.S. Bank account, American Riviera Bank for base payments under the RSA." And Fly Victor's Jackson offered an affidavit and invoices explaining that the PrivateJet site revenues never reached the minimum target volumes, so the RSA required Fly Victor to pay only the minimum monthly payments, which it did.

## B.

DLM filed suit in the Southern District of Florida against Jackson, Vorster, Northover, the John Does, Fly Victor, Alyssum Group, and Alyssum Holdings.

7

Fly Victor's Miami-based legal counsel informed DLM that it was not authorized to accept service on behalf of any defendant, so DLM hired a process service firm to serve the defendants in England. The firm served Fly Victor, Alyssum Group, and Alyssum Holdings at Fly Victor's London office. The server was unable to locate Northover, Jackson, or Vorster, so it left their documents together with the service documents for the company defendants at the Fly Victor reception desk. About a month later, Fly Victor's counsel informed DLM's attorney that he could "cancel any further efforts [of the] process server, as we will not be contesting service of process in our motions." At this point, the operative complaint did not rely on RICO's nationwide service of process provision to plead personal jurisdiction; instead, it invoked personal jurisdiction under Florida's long-arm statute, Fla. Stat. § 48.193.

Eventually, DLM amended its complaint to allege personal jurisdiction based on RICO's nationwide service of process provision. The amended complaint set out ten counts. First, DLM brought civil RICO claims against Jackson, Vorster, Northover, and the John Does (the "Individual Defendants") pursuant to 18 U.S.C. § 1962(c). DLM alleged that the Individual Defendants had participated in the affairs of both a legal entity enterprise, Fly Victor Ltd. itself, and an association-in-fact enterprise comprised of the Individual Defendants, Alyssum Group, Alyssum Group attorney Stephen Jones, and Alyssum Group

director Alexis Sozonoff working together for the common purpose of defrauding DLM and Fly Victor's investors. As for a pattern of racketeering activity, the Individual Defendants allegedly engaged in "multiple acts" of wire fraud in violation of 18 U.S.C. § 1343 and money laundering in violation of 18 U.S.C. §§ 1956, 1957. See 18 U.S.C. §§ 1961(1), (5).

The alleged wire fraud included making "materially false" interstate email and telephone statements to the effect that:

> 1) Defendant Fly Victor would pay [DLM] revenue shares for all leads generated by PrivateJet;[] (2) Defendant Fly Victor was actively working on its contractual obligations subsequent to the entry of the RSA; and (3) stating to [DLM] that Defendant Fly Victor never received one single lead from PrivateJet in three years.

Specifically, DLM pointed to the emails and telephone communications from Northover and Stephen Jones described above, which Jackson had allegedly directed. Northover's representations about website traffic and "big gains" expected from organic traffic were allegedly false. So was his 2018 statement that Fly Victor management had never fully backed the collaboration, and the same went for Jones's claim that DLM had never complained about Fly Victor's lack of payment.

The money laundering allegations related to Fly Victor's alleged scheme to use the "substantial revenues through leads generated by PrivateJet" to "'pump up'" Fly Victor's "health and value . . . in order to lure unsuspecting private equity

investors to infuse various rounds of capital funding." These revenues resulted from illegal activity, namely the wire fraud involved in deceiving DLM out of the revenue share payments owed. To disguise the funds' illegal nature, the Individual Defendants characterized them as "consulting" fees and paid them to companies they or close associates controlled. Some of these companies were undercapitalized or are in liquidation. Fly Victor also purportedly purchased and created shell company alter egos to hide the PrivateJet revenues. Count 2 alleged a conspiracy to violate RICO based on the same scheme and named the same Individual Defendants. See 18 U.S.C. § 1962(d). The remaining counts raised Florida law claims for conversion, fraudulent transfers, fraudulent misrepresentations, negligence, breach of fiduciary duty, tortious interference with business advantage, and breach of contract against various groupings of the Individual Defendants, Fly Victor, Alyssum Group, and Alyssum Holdings.

The defendants moved to dismiss the complaint pursuant to Federal Rules of Civil Procedure 4(e), 12(b)(2), 12(b)(3), and 12(b)(6). They claimed that the Southern District of Florida lacked personal jurisdiction over them and that venue was improper due to the RSA's forum selection clauses, which provided for exclusive jurisdiction in the courts of England. The defendants also argued that DLM had failed to state a claim for tortious interference with business advantage.

10

The district court granted the motion to dismiss on personal jurisdiction and forum selection clause grounds.  The court held that while RICO provided for personal jurisdiction based on nationwide service of process, DLM had failed to state a colorable RICO claim and therefore could not take advantage of this provision.  DLM had not plausibly identified any predicate acts of racketeering or sufficiently alleged the conduct of an enterprise.  Moreover, DLM's allegations "fail[ed] to establish even a weak connection" between the defendants and "any state."  Thus, the Fifth Amendment Due Process Clause also barred the court from exercising  personal jurisdiction.  The district court further held that the RSA's forum selection clause was mandatory and required dismissal.  Accordingly, the court dismissed the entire action without prejudice.  DLM's timely appeal followed.

## II.

We affirm the district court's dismissal for two independently sufficient reasons.  First, even assuming that DLM's RICO allegations are sufficiently colorable to invoke RICO's nationwide service of process provision, DLM did not serve any party in accordance with that provision.  RICO therefore does not supply a statutory basis for personal jurisdiction in this action, and DLM has not offered any alternative statutory basis.  Second, the forum selection clauses mandate dismissal.

11

A.

We begin with the district court's dismissal for lack of personal jurisdiction, which we review de novo, accepting the allegations in the complaint as true. It is by now almost axiomatic that a plaintiff bears the burden of establishing a prima facie case of personal jurisdiction, meaning it must present enough evidence to withstand a motion for a directed verdict. When a defendant submits non-conclusory affidavits to controvert the allegations in the complaint, the burden shifts back to the plaintiff to produce evidence to support personal jurisdiction. Finally, when the complaint and plaintiff's affidavits conflict with the defendant's affidavits, we draw all reasonable inferences in favor of the plaintiff. Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino, 447 F.3d 1357, 1360 (11th Cir. 2006).

In order for the district court to exercise personal jurisdiction over the defendants, an applicable statute must first confer personal jurisdiction. See SEC v. Marin, 982 F.3d 1341, 1349 (11th Cir. 2020). Then, the court must determine that the exercise of jurisdiction comports with due process. Id. For a statutory basis, DLM relies only on the RICO nationwide service of process provision found in 18 U.S.C. § 1965.[2] When "a federal statute provides for nationwide service of

---

[2] The complaint also references the Florida long-arm statute, but DLM argued in district court only in passing that this statute provided for personal jurisdiction, and it does not so argue on appeal. DLM has therefore abandoned any claim for personal jurisdiction arising under the Florida long-arm statute. Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1330–31 (11th

process, it becomes the statutory basis for personal jurisdiction over a person served according to the statute." Id. (internal quotation marks and citation omitted and emphasis added). In that case, "service of process constitutes the vehicle by which the court obtains [personal jurisdiction]." SEC v. Carrillo, 115 F.3d 1540, 1543 (11th Cir. 1997) (internal quotation marks and citation omitted).

The problem in this case is that RICO does not provide for personal jurisdiction because DLM did not serve any party "according to" RICO's nationwide service of process provision. In Republic of Panama v. BCCI Holdings (Luxembourg) S.A., we held that "[s]ection 1965(d) of the RICO statute provides for service in any judicial district in which the defendant is found."[3] 119 F.3d 935, 942 (11th Cir. 1997). That section reads this way:

---

Cir. 2004) (the Eleventh Circuit has "repeatedly held that an issue not raised in the district court . . . will not be considered by this court"; nor will an argument not briefed on appeal) (internal quotation marks and citation omitted).

[3] While we are bound by BCCI Holdings, we note that there is a dispute among the circuits as to exactly which of § 1965's subsections provides for nationwide service of process on RICO defendants. The Fourth Circuit has joined us in identifying § 1965(d) as the relevant provision. See ESAB Grp., Inc. v. Centricut, Inc., 126 F.3d 617, 626–27 (4th Cir. 1997). But a number of circuits hold that § 1965(b), rather than § 1965(d), permits nationwide service of process over RICO defendants. Laurel Gardens, LLC v. McKenna, 948 F.3d 105, 117 (3d Cir. 2020); FC Inv. Grp. LC v. IFX Markets, Ltd., 529 F.3d 1087, 1098–1100 (D.C. Cir. 2008), overruled on other grounds by Erwin-Simpson v. AirAsia Berhad, 985 F.3d 883 (D.C. Cir. 2021); Cory v. Aztec Steel Bldg., Inc., 468 F.3d 1226, 1229 (10th Cir. 2006); PT United Can Co. v. Crown Cork & Seal Co., 138 F.3d 65, 70–72 (2d Cir. 1998); Lisak v. Mercantile Bancorp, Inc., 834 F.2d 668, 671 (7th Cir. 1987); Butcher's Union Loc. No. 498 v. SDC Inv., Inc., 788 F.2d 535, 539 (9th Cir. 1986).

In its entirety, § 1965 reads:

13

(d) All other process in any action or proceeding under [RICO] <u>may be</u> <u>served</u> on any person <u>in any judicial district</u> in which such person resides, is found, has an agent, or transacts his affairs.

18 U.S.C. § 1965 (emphasis added).  DLM did not serve any defendant in any United States judicial district.  To the extent it served the Individual Defendants (the only ones named in the RICO counts) at all, it did so in London, England. Section 1965(d)'s authorization of service in any judicial district plainly does not authorize service outside the United States.  See <u>Cent. States, Se. & Sw. Areas</u> <u>Pension Fund</u> v. <u>Reimer Express World Corp.</u>, 230 F.3d 934, 941 (7th Cir. 2000) ("The RICO . . . service of process provision[] state[s] that service may be made in

---

(a) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.

(b) In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

(c) In any civil or criminal action or proceeding instituted by the United States under this chapter in the district court of the United States for any judicial district, subpenas issued by such court to compel the attendance of witnesses may be served in any other judicial district, except that in any civil action or proceeding no such subpena shall be issued for service upon any individual who resides in another district at a place more than one hundred miles from the place at which such court is held without approval given by a judge of such court upon a showing of good cause.

(d) All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs.

18 U.S.C. § 1965.  The choice between § 1965(d) and § 1965(b) does not matter in this case, because both provisions require service within the United States.  And DLM did not serve any defendant in any judicial district of the United States.

14

['any judicial district'], which indicates that Congress authorized service only in the judicial districts of the United States and not worldwide. In comparison, Congress authorized worldwide service in laws stating that service could be made 'wherever the defendant may be found,' or similar language, which is not limited to the judicial districts of the United States."). Thus, the nationwide service of process provision in RICO cannot provide for personal jurisdiction in this case.

DLM attempted to serve the Individual Defendants in London, England, and apparently canceled further efforts to serve them in response to defense counsel's agreement not to "contest[] service of process" in response to the initial complaint. (Emphasis added). DLM suggests that this communication effectively waived the defendants' ability to contest personal jurisdiction, but it did no such thing. Defense counsel's email waived, at most, the ability to argue that DLM's method of serving the defendants -- leaving a bundle of documents for several defendants at Fly Victor's London reception desk -- was insufficient. It did not waive the right to challenge personal jurisdiction. Personal jurisdiction and proper service are distinct requirements and distinct objections. See Fed. R. Civ. P. 4(d)(5) ("Waiving service of a summons does not waive any objection to personal jurisdiction or to venue."); Fed R. Civ. P. 12(b)(2), (5) (listing "lack of personal jurisdiction" and "insufficient service of process" as distinct defenses); see also Mann v. Castiel, 681 F.3d 368, 373 (D.C. Cir. 2012) ("Rule 4(d) contains a

15

procedure for establishing waiver of service of a summons. . . . Waiving service of a summons does not waive any objection to personal jurisdiction or to venue."); BSH Hausgeräte, GmbH v. Kamhi, 282 F. Supp. 3d 668, 676 (S.D.N.Y. 2017) ("Respondent's waiver of service and notice of appearance do not themselves confer jurisdiction over Respondent.").

Defense counsel's representations about insufficient service did not relieve DLM of its obligation to comply with the statutory prerequisites of the jurisdiction-conferring provision on which it now relies; that is, it was required to serve the Individual Defendants within the United States. Nothing obligated DLM to accept the defendants' invitation to cease its efforts to serve them, efforts DLM should have known would be central to the RICO-based personal jurisdiction claim it would bear the burden of proving. Nor did defense counsel's waiver of the right to contest the service method amount to an affirmative agreement to accept service in the United States on the defendants' behalf. Indeed, the only record communication regarding acceptance of service is an email from defense counsel (before the insufficient service waiver) informing DLM's attorney that his firm "ha[d] not been authorized to accept service on behalf of any Defendant." Moreover, when defense counsel agreed not to contest the service method, DLM had not yet asserted personal jurisdiction based on RICO's nationwide service of process clause. We need not and do not decide whether a waiver of service of

16

process could ever waive the right to contest personal jurisdiction under this clause because the facts and circumstances of this case demonstrate that the defendants' purported waiver was much more limited.

Even setting aside that no defendant was served in the United States, § 1965(d)'s remaining terms do not apply. None of the Individual Defendants resides or has an agent in any United States judicial district. Nor do they "transact [their] affairs" in any such district. DLM's only claims on this score are that Jackson is a director of, and Vorster is a director and officer of, an entity called YoungJets LLC, a California LLC that is authorized to do business in Florida and maintains a registered agent in Tallahassee. YoungJets changed its name to Fly Victor <u>Inc.</u> -- not to be confused with defendant Fly Victor <u>Ltd.</u> -- in 2018. But DLM does not make any allegations to support disregarding corporate separateness between Jackson and Vorster and YoungJets. <u>See</u> <u>United States ex rel. v. Mortg. Invs. Corp.</u>, 987 F.3d 1340, 1356 (11th Cir. 2021) (imputing corporation's contacts to corporate executive for purposes of establishing personal jurisdiction over executive only because the qui tam plaintiffs had sufficiently alleged that the corporation's veil should be pierced), <u>cert. denied sub nom.</u> <u>Mortg. Invs. Corp. v. United States ex rel. Bibby</u>, No. 20-1463, ___ S. Ct. ___, 2021 WL 1951877 (May 17, 2021).

17

Moreover, even if YoungJets's business activity could somehow be imputed to Jackson and Vorster, DLM does not allege any specific business activities YoungJets undertook in any United States judicial district. A defendant "transacts his affairs" in a district when he conducts substantial and continuous business within the district. Cf. KM Enters., Inc. v. Glob. Traffic Techs., Inc., 725 F.3d 718, 728, 731 (7th Cir. 2013) (the similar phrase "transacts business" in the Clayton Antitrust Act's venue provision, 15 U.S.C. § 22, which served as a model for RICO, refers to "the practical, everyday business or commercial concept of doing business or carrying on business of any substantial character") (quoting United States v. Scophony Corp. of Am., 333 U.S. 795, 807 (1948)); see also Corso v. Franz, No. 16CV2384FBSMG, 2018 WL 1513639, at *2 (E.D.N.Y. Mar. 27, 2018) (RICO's "transacts his affairs" language "requires that the affairs transacted in the district be substantial"); Jubilee House Cmty., Inc. v. Coker Int'l, Inc., No. 1:11CV45, 2013 WL 1232900, at *6 (M.D.N.C. Mar. 26, 2013) ("A defendant transacts his affairs in the district when he regularly transacts business of a substantial and continuous character within the district.") (internal quotation marks and citation omitted); Magic Toyota, Inc. v. Se. Toyota Distribs., Inc., 784 F. Supp. 306, 319 (D.S.C. 1992) ("The term 'transacts his affairs' was drawn from § 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, and has been interpreted to

18

require that a defendant regularly transacts business of a substantial and continuous character within the district.").

Similarly, the course of dealing between Fly Victor Ltd. and DLM does not establish that any Individual Defendant "transact[ed] his affairs" anywhere in the United States: DLM says that YoungJets and other subsidiaries were alter egos of Fly Victor Ltd., but does not allege that the corporate veil should be pierced between the Individual Defendants and Fly Victor Ltd.  See Mortg. Invs. Corp., 987 F.3d at 1356.  Fly Victor's limited United States dealings with DLM do not so much as even suggest that any of the Individual Defendants carried on a substantial and continuous course of business in the United States.

The long and short of it is that DLM did not serve any defendant within the United States.  RICO's nationwide (not worldwide) service of process provision cannot provide the statutory basis for personal jurisdiction in this case.  Therefore, we need not reach the further questions that would necessarily have arisen had DLM served the Individual Defendants in the United States -- namely whether DLM's RICO claims are sufficiently colorable to support reliance on RICO for personal jurisdiction and whether the exercise of personal jurisdiction over the defendants in the Southern District of Florida would offend due process.  See BCCI Holdings, 119 F.3d at 942.

19

B.

We also affirm on the independent and alternative ground that the contract's forum selection clauses required dismissal.

As a preliminary note, it was procedurally improper for the defendants to seek to enforce the forum selection clauses by means of a Rule 12(b)(3) motion to dismiss for improper venue rather than by filing a motion to dismiss for forum non conveniens. In Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas, the Supreme Court clarified that "the appropriate way to enforce a forum-selection clause pointing to a . . . foreign forum is through the doctrine of forum non conveniens." 571 U.S. 49, 60 (2013). The Court explained that Rule 12(b)(3) provides for dismissal only when venue is "improper" under the applicable federal venue statute, and that a forum selection clause cannot render venue improper when the action meets the requirements of the relevant venue statute. Id.

That said, the defendants' error in asking for dismissal under Rule 12(b)(3), rather than pursuant to forum non conveniens, does not require reversal. For one thing, DLM has not complained about this non-jurisdictional error. DLM's arguments and the district court's analysis both turned on the scope and enforceability of the forum selection clauses. These same threshold issues would have controlled even if the defendants and the district court had proceeded under forum non conveniens. Cf. id. at 62 n.5 (presupposing, before explaining the

20

analysis a court should undertake when analyzing a forum selection clause under forum non conveniens, that there was a "contractually valid forum-selection clause"). DLM has not argued or even remotely suggested that any public interest forum non conveniens factors require non-enforcement of the forum selection clauses. See id. at 64 (in the presence of a valid forum selection clause, "a district court may consider arguments about public-interest factors only," because the clause represents the plaintiff's agreement that the private interest factors cut in favor of the contractually-selected forum). The defendants' error in styling their motion as arising under Rule 12(b)(3) did not affect the issues that control their request for dismissal or the district court's analysis, so the error did not prejudice DLM in any way. This error was harmless. See Johnson v. NPAS Sols., LLC, 975 F.3d 1244, 1254–55 (11th Cir. 2020) (error in application of Federal Rules of Civil Procedure was harmless because it did not deprive the complaining party of the opportunity to present arguments that would have altered the outcome); Vista Mktg., LLC v. Burkett, 812 F.3d 954, 978 (11th Cir. 2016); Stansell v. Revolutionary Armed Forces of Colom., 771 F.3d 713, 746 (11th Cir. 2014).

What's more, a successful forum non conveniens motion, like a Rule 12(b)(3) motion, results in dismissal. See Atl. Marine Const. Co., 571 U.S. at 60. So it was not improper to seek to enforce the forum selection clauses by motion to dismiss; it was simply improper to invoke Rule 12(b)(3) in doing so. Cf. Mueller

v. Apple Leisure Corp., 880 F.3d 890, 894 (7th Cir. 2018) ("Although [the defendant] had not formally moved to dismiss based on forum non conveniens, the dismissal motion plainly invoked the forum-selection clause and asked the court to enforce it.  Accordingly, the judge was well within his discretion to treat the motion as, in substance, a forum non conveniens motion.").  For its part, the district court did not rely on any Rule 12(b)(3) or venue-specific reasoning to grant the motion to dismiss; it simply held that the forum selection clauses were valid, clear, enforceable, and applied to DLM's case.  "[B]ecause [DLM] pointed to no public interest to justify setting aside the contractual choice of forum," the district court's dismissal "was procedurally . . . correct."  See id. at 895.

Dismissal was substantively correct, as well.  Again, the RSA contains two clauses relevant to forum selection:

> 13. **CHOICE OF LAW**
>
> 13.1 This Agreement, and any issues or disputes arising out of or in connection with it (whether such disputes are contractual or non-contractual in nature, such as claims in tort, for breach of statute or regulation or otherwise) shall be governed by and construed in accordance with English law and the parties hereby submit to the exclusive jurisdiction of the English Courts.
>
> . . .
>
> 22. **LAW AND JURISDICTION**
>
>  . . .
>
> 22.2 The courts of England shall have exclusive jurisdiction to adjudicate any dispute which arises out of or in connection with this Participation Agreement, provided that Victor shall be entitled to take

22

proceedings relating to this Participation Agreement in any other jurisdiction.

These clauses unambiguously require an English forum. They are mandatory, rather than permissive; they "dictate an exclusive forum for litigation [related to] the contract." Glob. Satellite Commc'n Co. v. Starmill U.K. Ltd., 378 F.3d 1269, 1272 (11th Cir. 2004) (internal quotation marks and citation omitted). This much is clear from the repeated use of the modifier "exclusive" and from the use of the verb "shall." See Slater v. Energy Servs. Grp. Int'l, Inc., 634 F.3d 1326, 1330 (11th Cir. 2011) ("[T]he plain meaning of a contract's language governs its interpretation."); compare Glob. Satellite, 378 F.3d at 1272 (relying on the use of the "imperative" "shall" to conclude that a forum selection clause was mandatory) with Citro Fla., Inc. v. Citrovale, S.A., 760 F.2d 1231, 1231–32 (11th Cir. 1985) (forum selection clause that simply stated "Place of jurisdiction is Sao Paulo/Brazil" was permissive). There can be no doubt that these are mandatory forum selection provisions. They require that all disputes falling within their ambit be litigated in England.

Nonetheless, DLM offers four arguments as to why the district court erred in deciding that these clauses required dismissal: the forum selection clauses were the product of fraud; they should not be enforced because they treat the parties unevenly; their terms do not apply to this dispute; and dismissal in favor of an English forum would be unreasonable and unjust. None is persuasive.

23

*Fraud.* In this federal question case, federal law determines the enforceability of the forum selection clauses. In re McGraw-Hill Glob. Educ. Holdings LLC, 909 F.3d 48, 58 (3d Cir. 2018); All. Health Grp., LLC v. Bridging Health Options, LLC, 553 F.3d 397, 399 (5th Cir. 2008); cf. Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 590 (1991) (admiralty case). We review the enforceability of a forum selection clause de novo. Rucker v. Oasis Legal Fin., L.L.C., 632 F.3d 1231, 1235 (11th Cir. 2011); Lipcon v. Underwriters at Lloyd's, London, 148 F.3d 1285, 1290–91 (11th Cir. 1998).

Under federal law, forum selection clauses "are presumptively valid and enforceable unless the plaintiff makes a strong showing that enforcement would be unfair or unreasonable under the circumstances." Rucker, 632 F.3d at 1236 (internal quotation marks and citation omitted). A plaintiff can defeat this presumption by showing (1) that the clause "was induced by fraud or overreaching; (2) the plaintiff would be deprived of its day in court because of inconvenience or unfairness; (3) the chosen law would deprive the plaintiff of a remedy; or (4) enforcement of the clause would contravene public policy." Id. (citing M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972)). "[A] valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases." Atl. Marine, 571 U.S. at 63 (internal quotation marks and citation omitted).

24

DLM has not made a "strong showing" that the forum selection clauses in the RSA were the product of fraud. First, DLM's reliance on the broader alleged fraudulent scheme to deprive DLM of its rightful PrivateJet revenue share is a nonstarter. The fraud exception "does not mean that any time a dispute arising out of a transaction is based upon an allegation of fraud, as in this case, the clause is unenforceable. Rather, it means that a[] . . . forum-selection clause in a contract is not enforceable if the inclusion of that clause in the contract was the product of fraud or coercion." Scherk v. Alberto-Culver Co., 417 U.S. 506, 519 n.14 (1974). To be sure, DLM does allege that Fly Victor included the forum selection clauses themselves "with the underlying intent to defraud" DLM and to "*weaponize* the choice of venue and choice of law provisions as a shield to protect their fraudulent scheme and enterprise." DLM also alleges that Fly Victor drafted the RSA and that the forum selection clauses were "unnegotiated." But DLM does not provide plausible support for any of these conclusory allegations. See Lipcon, 148 F.3d at 1296 (finding allegations that a forum selection clause was the product of fraud "insufficient to satisfy . . . [the] rigorous standard for pleading fraud" even though, unlike here, the complaint identified specific alleged misleading statements about the forum selection clause itself). In fact, DLM negotiated at least some provisions of the RSA and does not identify any reason it could not have objected to the forum selection clauses too. The parties exchanged (at least) a draft term sheet

25

proposal and a redlined version of the draft RSA, the latter of which contained the same forum selection clauses that appear in the final RSA. DLM asked for specific provisions to be altered or included in the contract but, notably, did not object to the forum selection clauses. Moreover, this negotiation was at arm's length between sophisticated corporate entities; DLM even hired a consultant to help it negotiate the deal.

*Reciprocity.* DLM also relies on the Section 22.2 clause, which it claims is somewhat inconsistent with the Section 13.1 clause in that Section 22.2 allows Fly Victor, but not DLM, to take at least some proceedings in a non-English forum. DLM says that this inconsistency renders the clauses ambiguous. But any ambiguity regarding Fly Victor's forum obligations is irrelevant to a suit brought by DLM. As applied to DLM, both clauses harmoniously mandate an English forum. DLM has not identified any cases suggesting that forum selection clauses must provide reciprocal and equal benefits to contracting parties to be enforceable. And we have found none. Indeed, we have found some authority to the contrary. Danmar Lines, Ltd. v. CMA CGS S.A., No. 09-22857-CIV, 2010 WL 5174975, at *3 (S.D. Fla. June 16, 2010) ("[F]orum selection clauses do not need to provide reciprocal and equal benefits to contracting parties to be enforceable."). That a bargained-for provision may be more favorable to one party than another as to the choice of forum does not make the contract ambiguous or suggest fraud.

26

*Scope.* DLM next argues that the forum selection clauses do not apply to this dispute. This, too, is unpersuasive. As we have seen, the forum selection clauses are mandatory so far as they apply. DLM relies on Green Leaf Nursery v. E.I. DuPont De Nemours & Co., 341 F.3d 1292, 1300–01 (11th Cir. 2003) to argue that the clauses do not apply to its claims. But Green Leaf confronted a choice of law clause that, by its terms, governed only the release of the claims component of a broader settlement agreement: "this release shall be governed" by Delaware law, read the clause. Id. at 1300 (alteration adopted). We held that the clause extended only to the release, and not to tort claims or other disputes arising out of the settlement agreement or the parties' broader relationship. Id. at 1300–01. All Green Leaf stands for is the unremarkable proposition that a choice of law clause (and a forum selection clause) extends only so far as its terms allow.

Here, the forum selection clauses could hardly be broader; indeed, they are far broader than the release-specific clause in Green Leaf. Section 13.1 extends to "any issues or disputes arising out of or in connection with [the RSA] (whether such disputes are contractual or non-contractual in nature, such as claims in tort, for breach of statute or regulation or otherwise)." (Emphasis added). Section 22.1 likewise provides for exclusive English jurisdiction "to adjudicate any dispute which arises out of or in connection with" the RSA. (Emphasis added). Any issues or disputes in connection with the RSA means all issues or disputes in

27

connection with the RSA "because 'any' means all." Anders v. Hometown Mortg. Servs., Inc., 346 F.3d 1024, 1028 (11th Cir. 2003) (internal quotation marks and citation omitted).

The gravamen of DLM's RICO claims (as well as its contract and other state law claims) is that Fly Victor engaged in fraud by falsely promising, in the RSA, that it would actively improve and maintain the PrivateJet site and share resulting revenues with DLM. These claims fit squarely within the terms of the forum selection clauses: they include both "contractual" and "non-contractual" claims, including "for breach of statute," all of which are plainly "in connection with" the RSA. See Stewart Org., Inc. v. Ricoh Corp., 810 F.2d 1066, 1070 (11th Cir. 1987) (en banc) (forum selection clause that provided for exclusive jurisdiction in Manhattan over "any case or controversy arising under or in connection with [the] Agreement" covered "all causes of action arising directly or indirectly from the business relationship evidenced by the contract," including claims for breach of warranty, fraud, and antitrust violations), aff'd and remanded on other grounds, 487 U.S. 22, (1988).

*Unreasonable/unjust.* Finally, DLM suggests that enforcement of the forum selection clauses would be unreasonable and unjust because it would require DLM to litigate "a complex civil RICO fraud and money laundering matter before a foreign court which would have little to no knowledge and experience hearing such

28

a matter." DLM also notes that England does not recognize civil RICO claims and so does not provide "redress for the civil RICO conduct" DLM alleges. But "a plaintiff's inability to assert a RICO claim in the foreign forum does not preclude forum non conveniens dismissal." BCCI Holdings, 119 F.3d at 952. Nor does DLM's passing reference to English courts' lack of familiarity with the governing law come close to demonstrating that litigating this matter in an English forum will "deprive[] it of its day in court." Rucker, 632 F.3d at 1236 (citation omitted). There is no reason to think the English courts will be unable to discern and fairly apply the governing law, whatever it may be. See Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d 953, 958 (10th Cir. 1992) ("[O]ur courts have long recognized that the courts of England are fair and neutral forums.") (citing M/S Bremen, 407 U.S. at 12).

All told, the forum selection clauses are enforceable, apply to DLM's claims, and mandate the dismissal of this case. So does DLM's failure to establish personal jurisdiction. Accordingly, we **AFFIRM**.